UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 664 |
| vs. | ) | |
| | ) | Judge Charles R. Norgle |
| TUQIANG XIE | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On August 20, 2019, the United States filed an information against defendant Tuqiang Xie. The information charged Xie with engaging in brokering activities involving military equipment with the People's Republic of China without registration or a license in violation of Title 22, United States Code, Section 2778(c) and applicable regulations (Count One). The information also charged Xie with filing a false income tax return for calendar year 2013 in violation of Title 26, United States Code, Section 7206(1) (Count Two). On September 10, 2019, Xie pled guilty to both charges pursuant to a written plea agreement. Xie is scheduled to be sentenced on March 30, 2022. The government requests that this Court impose a sentence of one year and one day based on Xie's offenses.

## I.    BACKGROUND

The Arms Export Control Act ("AECA"), Title 22, United States Code, Section 2778, *et seq*., regulates the export of articles used in military defense from the United States to other countries.  The AECA authorizes the President of the United States to, among other things, designate certain defense articles on what is known as the

United States Munitions List ("USML") and to thereafter require licenses or other approvals before defense articles on the USML can be exported. Generally, except as specifically provided in AECA-based regulations, "no defense articles . . . may be exported or imported without a license for such export or import. *See* 22 U.S.C. 2778(b)(2).

The strict controls imposed by the AECA are necessary because of the nature of the items involved. The items on the USML are components and systems used currently by the United States armed forces in military equipment. The technical information about the USML components, as well as the distribution of the actual components to outside sources, is highly regulated as a result. The regulations associated with the AECA require that, in addition to obtaining licenses, individuals involved in the businesses of manufacturing or exporting defense articles register with the United States Department of State, Directorate of Defense Trade Controls (DDTC).

The responsibility for regulating the export and import of defense articles is split between two federal agencies. The DDTC regulates the export of defense articles outside the United States. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is responsible for regulating the importation into the United States of defense articles. The defense articles governed by ATF are on an import-based list known as the United States Munitions Import List (USMIL).

In 1989, the United States imposed an arms embargo on the People's Republic of China ("PRC"). This meant that the ATF considered the PRC to be a "prohibited country" for purposes of arms imports. Similarly, for exports, the embargo prohibited the export of arms, such as USML-listed defense articles, to the PRC. The arms embargo with the PRC was in place during the relevant period of this case.

Xie, through his company, Bio-Medical Optics, LLC in Irvine, California, served as a broker for the shipment of defense articles on the USML to and from the PRC. "Defense articles" includes both military components as well as the corresponding technical data to build them. Xie located manufacturers in the PRC to produce defense articles for United States clients. Xie earned commissions or fees based on his role in these shipments. Xie never registered with the DDTC and he never applied for an export or import license. Xie made shipments to and received shipments from the PRC despite the existence of the arms embargo.

One of Xie's clients was an entity called Vibgyor Optical Systems, Inc. Vibgyor's owner, Bharat ("Victor") Verma, operated Vibgyor out of his Arlington Heights, Illinois house. Vibgyor's daughter, Urvashi ("Sonia") Verma, was also involved in the business. Vibgyor purported to manufacture optical lenses and equipment and largely served as a subcontractor on Department of Defense contracts. This meant that another company, known as a "prime contractor," was awarded a contract by the Department of Defense to supply the DOD with military components. The prime contractor, in turn, could arrange for another company like Vibgyor to

manufacture the parts. Vibgyor then became a subcontractor to the prime contractor. But here, unbeknownst to the prime contractors, but as fully known by Xie, Vibgyor did not itself manufacture the required parts. Vibgyor instead, either on its own or through Xie, sent the parts to the PRC to be manufactured there. Xie then imported the parts and sent them to Vibgyor. Vibgyor sent the parts to the prime contractor for delivery to the DOD. Neither the prime contractor nor the DOD knew the parts had been manufactured in the PRC. Vibgyor used the PRC to manufacture the military parts because it cost less to manufacture the parts there and Vibgyor made more profit as a result.

Xie also did business with one of Bharat Verma's family members, Individual A, who operated as a prime contractor known as Defense Contractor A. Individual A arranged for Vibgyor to serve as the subcontractor on Defense Contractor A's DOD contracts and Xie assisted in these transactions. Xie also facilitated shipments of defense articles to and from the PRC for Broker B. Broker B transferred the PRC-made defense articles to Vibgyor after receiving them from Xie.

Xie and Vibgyor had a longstanding relationship which spanned from 2006 to 2014. Xie's relationship with Broker B extended into 2015. In approximately November 2006, Bharat Verma asked Xie about obtaining optical components from one of Xie's contacts in the PRC. On November 29, 2006, Xie sent Verma an email outlining the types of optical components Xie could acquire. The email described Bio-Medical as having a manufacturing facility in the PRC's Hubei province. A short time

later, Vibgyor began to order items, largely military optical technology, from Bio-Medical. From the beginning, Xie, acting as a broker, sent USML defense articles, consisting of both military components to be used as samples and technical data, including drawings, for the components, to manufacturing facilities in the PRC. Xie knew early on that federal agents had seized incoming shipments from the PRC to Vibgyor and that Bharat Verma wanted to use Xie's company, Bio-Medical, as the purported importer in order to prevent future seizures. This maneuvering meant that it was not possible for a period of time, from Customs documentation alone, for law enforcement to determine that Vibgyor was, in fact, the end customer for the PRC-manufactured defense articles. Xie also misidentified the articles in the shipments and their cost on the Customs documentation at Vibgyor's request to further evade Customs scrutiny.

In 2008, federal agents learned that Xie was involved in the shipments from the PRC to Vibgyor. Xie thereafter, between 2008 and 2015, had numerous interactions with federal agents. The agents told Xie about export and import regulations and the need to obtain export licenses. The agents drew Xie's attention to the DOD notations on the technical data from Vibgyor that Xie sent to the PRC. Yet Xie did not change his ways. Xie continued to do business with Vibgyor, as well as with Individual A and Broker B, during the time period of the interactions.

In approximately July 2014, Broker B asked Xie to quote a price for a quantity of eyepiece assemblies. The transaction that followed serves as the basis of the AECA

charge in Count One to which Xie pled guilty. The eyepiece assemblies, known for DOD purposes as National Stock Number 1240-01-063-1352, were part of the thermal sighting systems in M60A3 battle tanks. The eyepiece assemblies were on the USML. On or about August 4, 2014, Xie agreed to get Broker B 25 of the eyepiece assemblies from a PRC manufacturer. Between August 2014 and mid-February 2015, Xie brokered the importation of the PRC-made completed eyepiece assemblies into the United States. Xie sent the eyepiece assemblies to Broker B once they arrived. Xie knew that the eyepiece assemblies were on the USML at the time he made the arrangements for the eyepiece assemblies to be made in the PRC and for the completed eyepiece assemblies to be imported into the United States. Xie did not obtain licenses for the shipments and he did not register as a broker in connection with them.

Over the years, Vibgyor, Defense Contractor A, and Broker B paid Xie for the services Xie provided to them. Between approximately 2007 and 2014, Xie and Bio-Medical received payments totaling nearly $800,000 for Xie's brokering services. Bio-Medical made payments to Chinese manufacturers totaling nearly $600,000 for the items manufactured there. Xie and Bio-Medical, then, made a profit of approximately $200,000 through the unlawful sending of defense articles to the PRC, at least some of which were USML-listed, and the unlawful importation of the manufactured parts into the United States.

Xie underreported his income to the Internal Revenue Service on his federal income tax returns during the period of this case, that is, on the federal income tax returns he filed between 2009 and 2013. This false reporting had the effect of lowering the amount of taxes Xie had to pay. Xie's false income tax return for calendar year 2013 serves as the basis of Count Two to which Xie pled guilty. Xie misrepresented on the 2013 return that the amount of Bio-Medical's gross receipts and sales was $568,463 when, in fact, the amount was $785,085. This created a tax loss of $3,640. The combined tax loss for Xie's underreporting between 2009 and 2013 is between $100,000 and $250,000. Xie succeeded in underreporting Bio-Medical's gross receipts for so many years by maintaining two sets of books—one true set and one false set. Xie gave his tax preparer the false set of books that underreported the income he received and that omitted entire sales transactions. The tax preparer relied on the false set of books to prepare Xie's income tax returns. Xie swore to, signed, and caused to be filed the 2013 income tax return which Xie knew to be false.

## II.  GUIDELINES CALCULATIONS

The government agrees with the Guidelines calculations found in the Presentence Investigation Report. PSR ¶¶ 23-51.

### A.  Base Offense Level.

The government agrees that, for Count One (AECA violation) the base offense level is 26 under USSG § 2M5.2. The government agrees that, for Count Two (the false return count), the base offense level is 16 under USSG §§ 2T1.1 and 2T4.1

because the tax loss for the instant offense ($3,640) and the relevant conduct is at least $100,000 but not greater than $250,000. PSR ¶ 30. None of the specific offense characteristics for either offense apply in Xie's case. The government agrees that the combined adjusted offense level is 26. ¶ 39.

**B.    Reduction for Acceptance of Responsibility.**

The government agrees that, at this time, Xie has accepted responsibility for his offense and that Xie is entitled to a three-level reduction pursuant to Guideline §§ 3E1.1(a) and 3E1.1(b). PSR ¶¶ 41-42.

**C.    Criminal History Calculation.**

The government agrees that Xie has zero criminal history points and a criminal history category of I. PSR ¶¶46-51.

**D.    Adjusted Offense Level and Advisory Guidelines Range.**

The government agrees that Xie has an adjusted offense level of 23 (PSR ¶ 43), a criminal history category of I (PSR ¶ 48), and an advisory Sentencing Guidelines range of 46 to 57 months' incarceration (PSR ¶ 78).

**III.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)**

**A.    Nature and Circumstances of the Offenses.**

In March 2011, during an interview with federal agents, Xie stated that Vibgyor provided him with original DOD technical data and that, over the years, he had sent several hundred technical drawings to the PRC on Vibgyor's behalf. Xie stated he sent samples, meaning actual component parts, with the technical data

8

about 10% of the time. Xie continued to send technical data and samples to the PRC for at least three years after this interview took place.

Xie's conduct over multiple years caused a massive volume of sensitive technical data—the blueprints for manufacturing equipment in current use by the United States military—to be released to a country to which the United States had prohibited any such shipments from taking place. Xie violated every layer of protection imposed by the relevant statutes, regulations, rules, and the arms embargo through his conduct. Xie repeatedly jeopardized the security of the sensitive military information without the DOD knowing the information had been released. Some of the component parts manufactured in the PRC, once placed into United States military equipment failed, or did not work at all. These failures could have had significant consequences if the failures occurred in battle.

There is no evidence in this case, as Xie points out, that Xie had any intent to enable the Chinese government, or any other foreign party, to possess or develop military items for its own use. R. 32 at 7. But this absence of intent does not negate the seriousness of Xie's crime. Xie did nothing to prevent the Chinese government or another foreign party from obtaining the technical data or sample parts and his actions made such an event entirely possible. Xie's release of the sensitive military information to Chinese manufacturers, without any restriction whatsoever, was the equivalent of releasing the sensitive military information to the world.

Xie posits that the information Xie obtained from Vibgyor and that Xie then released to the PRC was not "of such great sophistication that its disclosure to China would seriously jeopardize United States military secrets or give China greater technological or tactical advantage over the United States." *Id.* at 8 (internal quotations omitted). But this conclusion, to the extent it is accurate, relies on the benefit of analytical hindsight and, for Xie, given the lack of regard he gave the information, pure luck. Between 2006 and 2014, when Xie released the technical data and samples to the PRC, Xie did not determine the level of sophistication of the information or even the function of the defense articles before he sent the technical data and samples to the PRC. If, indeed, Xie's disclosures to the PRC can all be characterized as not involving "sophisticated" equipment, a point the government does not accept, then this is attributable to happenstance and not any care or caution on Xie's behalf. It is ironic that Xie now seeks to be the beneficiary of a "sophistication" assessment that he himself did not care to make at the time. It is also worth noting that the embargo prohibiting the export of information did not distinguish between the sophistication of the information involved.[1]

Xie used misrepresentations and concealment in both of the offenses to which he pled guilty. Xie agreed to use his company to shield Vibgyor's role in the PRC

---

[1] The government recognizes that a court can consider the nature of the defense articles at the core of an export control violation in determining a defendant's sentence. The government does not mean to suggest otherwise. Here, while some of the defense articles Xie facilitated being manufactured in the PRC may have been small in size or generic in function, not all of them can be so classified. The eyepiece assembly that is the subject of Count One, for example, was critical to the function of military tanks.

process and to prevent Customs from seizing shipments by providing innocuous and misleading descriptions of the contents on Customs documentation. Xie also hid the true amount of money he earned through his participation with Vibgyor, Defense Contractor A, and Broker B by maintaining two sets of books and by providing his tax preparer with only the false set of books when it came time to compute the amount Xie owed in taxes.

### B. History and Characteristics of the Defendant.

Xie was between 44 and 52 years old during the time frame of his offenses (2006 to 2014). Xie was well-educated, an educator himself, and a self-employed businessman. Xie was not new to the world of optics or exports and imports when he and Vibgyor entered into the business arrangement. Xie advertised on the Bio-Medical webpage, for example, that the company had manufacturing facilities in China.

Xie was repeatedly warned by federal agents that he might be in violation of federal law by exporting and importing defense articles on Vibgyor's behalf. The agents told Xie about registration requirements, the USML, and export and import licenses. Xie did not heed what he was told and chose instead to continue his affiliation with Vibgyor, Defense Contractor A, and Broker B, and to conduct business in what was to them the usual way. A federal agent first talked to Xie about export and import regulations in July 2008. Federal agents then interviewed Xie in November 2008, March 2011, May 2011, and February 2015. The agents discussed

11

with Xie the Vibgyor shipments to the PRC during each of these interviews. Federal agents twice searched Xie's residence pursuant to search warrants, in May 2011 and February 2015, and, in February 2011, seized a laptop computer in Xie's possession at the Los Angeles International Airport just before Xie boarded a flight to Shanghai, China. The agents repeatedly informed Xie that he was not permitted to export technical data for items contained on the USML without first obtaining a license. Xie chose instead to never register and to never obtain a license. Instead, Xie continued to send technical data and samples for USML items to the PRC and he continued to import the completed items through Bio-Medical on Vibgyor's behalf.

Xie's current age, 60 years old, while on the older end of the ages of current federal inmates, is not itself remarkable. This is particularly so here because Xie did not commit the charged offenses until he was between 44 and 52 years old. Xie would not be the only 60-year-old in the Bureau of Prisons if he is given a sentence of imprisonment. The current figures reflect that approximately 5.5% of the inmates in the Bureau of Prisons are between the ages of 56 and 60. *See* https://www.bop.gov/about/statistics/statistics_inmate_age.jsp. There is no indication that Xie's medical conditions, high blood pressure and high cholesterol, cannot be controlled with medication. The long-term significance of the shadow on Xie's lungs is unclear. The COVID concerns have been mitigated by the fact that Xie has had COVID-19 and he has been vaccinated. There is nothing in Xie's available medical

history that suggests Xie cannot withstand the government's recommended term of imprisonment of one year and one day.

### C. The Need to Avoid Unwarranted Sentencing Disparities.

In 2015, Vibgyor, Bharat Verma, and Verma's daughter, Urvashi Verma, were indicted. *See* Case No. 15 CR 18 (N.D. Ill) (Bucklo, J.). Vibgyor and Bharat Verma pled guilty. Urvashi Verma went to trial and was convicted of conspiracy to violate the AECA and acquitted of a substantive AECA charge. Bharat Verma's sentencing range was 78 to 97 months. The government recommended 60 months which represented a 25% reduction from the low end of the range. Bharat Verma received a sentence of 8 months incarceration. Urvashi Verma's sentencing range was 26 and her range was 63 to 78 months. The government recommended that Urvashi Verma receive a sentence of 30 months which represented a 50% reduction from the low end of the range. Urvashi Verma received a sentence of four years' probation.

Xie's sentencing range, which, like the ranges for Bharat and Urvashi Verma, is driven by the AECA offense, is 46 to 57 months. The government recommends that Xie receive a sentence of imprisonment of one year and one day in order to avoid disparity between his sentence and those received by the Bharat and Urvashi Verma. A sentence of incarceration is appropriate. Xie's conduct is much more aligned with that of Bharat Verma than that of Bharat Verma's daughter. Xie and Bharat Verma worked in tandem for years to make the shipments to and from the PRC happen and to proceed undetected. Xie made significant profits from his affiliation with Vibgyor

and the related entities and Xie was undeterred by the repeated warnings by agents about the potential illegality of his conduct. Xie is much less similar to Urvashi Verma, who got involved with Vibgyor through her father. Xie, in contrast, ran his own independent company at the time Xie affiliated himself with Vibgyor and Xie chose to begin the affiliation and to continue with it for years.

### D.     The Need to Afford Adequate Deterrence.

There is a need here for both specific and general deterrence. Xie was not deterred by the repeated warnings by federal agents about his conduct and a sentence of imprisonment will provide specific deterrence to him in this case. General deterrence is also necessary so that the message is clear to the public that there are consequences to exporting USML data and samples to an embargoed country and that the export and import statutes and regulations as to defense articles cannot be ignored.

## IV.    SUPERVISED RELEASE

The government has no objections to the conditions of supervised release proposed by the Probation Office. In *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the Seventh Circuit held that sentencing courts must make an independent determination that each condition of supervised release imposed on a defendant is rationally and reasonably related to the offense conduct and characteristics, and to the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D). 2015 WL 151609 at *6-7. This Court must state

the reasons for imposing each condition, and ensure each condition is not broader than necessary to achieve the purposes of sentencing. *Id*. In light of the Court's ruling in *Thompson*, the government concurs with the Probation Office and asks the Court to impose the following conditions of supervised release:

The following conditions are mandatory under 18 U.S.C. § 3583(d):

1. The defendant shall not commit another federal, state, or local crime.

2. The defendant shall not unlawfully possess a controlled substance.

3. The defendant shall submit to the collection of a DNA sample as directed by the probation officer.

Under 18 U.S.C. § 3583(d), the Court has discretion to impose conditions of supervised release that are "reasonably related" to the factors set forth in 18 U.S.C. § 3553(a), that "involve[ ] no greater deprivation of liberty than is reasonably necessary," to meet the goals of § 3553(a), and that are "consistent with any pertinent policy statements issued by the Sentencing Commission." The following conditions are consistent with the factors set forth in § 3553(a) and should be imposed on the basis that they facilitate supervision by the probation officer, which is important here, to promote Xie's respect for the law and deter him from future crimes.

1. The defendant shall seek, and work conscientiously at, lawful employment or, if not employed, shall pursue conscientiously a course of study or vocational training that will equip him for employment.

2. The defendant shall not knowingly meet or communicate with any person whom he knows to be engaged, or planning to be engaged, in criminal activity.

3. The defendant shall refrain from the excessive use of alcohol.

4. The defendant shall not possess a firearm, destructive device, or other dangerous weapon.

5. The defendant shall not knowingly leave from the judicial district where he is being supervised, unless granted permission to leave by the court or a probation officer.

6. The defendant shall report to a probation officer as directed by the court or a probation officer.

7. The defendant shall permit a probation officer to visit the defendant at any reasonable time at home, work, community service location, or other reasonable location specified by a probation officer.

8. The defendant shall permit confiscation of any contraband observed in plain view of the probation officer.

9. The defendant shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. The defendant shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

10. The defendant shall notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

11. The defendant shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance wit the law under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, the defendant shall not reenter the United States without obtaining, in advance, the express written consent of the Attorney General or the Secretary of the Department of Homeland Security.

The government agrees that the following proposed special conditions are consistent with the factors set forth in § 3563(b)(2) and 3583(d) and should be imposed on the basis that they facilitate supervision of Xie by the probation officer,

which is important here, to promote Xie's respect for the law and to deter him from

future crimes.

1. The defendant shall not incur new credit card charges or open additional lines of credit without the approval of a probation officer unless the defendant is in compliance with the financial obligations imposed by the judgment order.

2. The defendant shall provide a probation officer with access to any requested financial information necessary to monitor compliance with other conditions of probation.

3. Within 72 hours of any significant change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments, the defendant must notify the probation officer of the change.

4. The defendant shall file accurate income tax returns and pay all taxes, interest and penalties as required by law.

5. The defendant shall pay to the Clerk of the Court any financial obligation ordered by the court that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of the defendant's gross earnings minus federal and state income tax withholdings.

6. The defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

The government agrees with the PSR that these mandatory, discretionary, and

special conditions are necessary to: (1) afford adequate deterrence; (2) protect the

public from further crimes by Xie; (3) provide Xie with needed medical care in the

most effective manner; (4) keep the probation officer informed about Xie's conduct,

condition, and compliance; (5) enhance officer and Xie's safety; (6) allow the probation

officer to targe interventions and factors that may reduce Xie's risk of reoffending;

17

and (7) assist Xie to be engaged in responsible fiscal behavior while complying with the need to pay the Internal Revenue Service taxes and interest owed.

## V.     RESTITUTION

Xie agreed in the plea agreement to pay restitution to the United States Treasury arising from his offense and relevant conduct. But there is no current actual tax loss and no restitution owed at this time and, as a result, this Court need not order restitution.

## VI.     FORFEITURE

Xie agreed in the plea agreement to the entry of a personal money judgment in the amount of $200,027, which represents the total amount of proceeds traceable to the offense. Xie consented to the immediate entry of a preliminary order of forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

## VII.     CONCLUSION

For the foregoing reasons, the United States respectfully requests this Court impose a below Guidelines sentence of one year and one day.

JOHN R. LAUSCH, JR.
United States Attorney

By:     /s/ Diane MacArthur
DIANE MacARTHUR
Assistant United States Attorney
219 S. Dearborn Street
Chicago, IL 60604
(312) 353-5352

Dated:  March 25, 2022

18